UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JANET ADERHOLD,
     Plaintiff,

vs.                           Case No.: 3:20cv5411/LAC/EMT

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]
     Defendant.
_____/

## <u>ORDER and REPORT AND RECOMMENDATION</u>

This case was referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.* The case is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of the SSA (Commissioner) denying Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381–83. Upon review of the record before the court, it is the opinion of the undersigned

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration (SSA) on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), Ms. Kijakazi is automatically substituted for Andrew Saul as the Defendant in this case.

that the findings of fact and determinations of the Commissioner are supported by substantial evidence and that the decision of the Commissioner, therefore, should be affirmed.

## ISSUES ON REVIEW

Plaintiff raises two issues on appeal, arguing the Administrative Law Judge (ALJ) erred in (1) finding she does not require an assistive device—specifically, a cane or walker; and (2) failing to "articulate good cause supported by substantial evidence to discredit the opinion of limitation rendered by Dr. Schneider, a treating physician" (ECF No. 13 at 2).

## PROCEDURAL HISTORY

On June 23, 2017, Plaintiff filed an application for SSI alleging disability beginning June 1, 2016, due to neuropathy in her hands and feet, diabetes, pancreatitis, gallbladder problems, and high cholesterol (tr. 94–105, 187–92). [2] Plaintiff's application was denied initially and on reconsideration; Plaintiff thus requested a hearing before an ALJ (*id.* at 94–105, 107–19).   A hearing was held on May 7, 2019, at which Plaintiff's counsel amended the alleged onset date to June 23,

---

[2]  All references to "tr." refer to the transcript of the SSA record filed on November 2, 2020 (ECF No. 9).   Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

2017 (*id.* at 70).   On June 10, 2019, the ALJ issued a decision finding Plaintiff not disabled under the Act (*id.* at 7–24).   Plaintiff petitioned the Appeals Council for review of the ALJ's decision (*id.* at 184–86).   The Appeals Council denied Plaintiff's request (*id.* at 1–6).   The ALJ's decision thus stands as the final determination of the Commissioner subject to review in this court.   *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

<u>FINDINGS OF THE ALJ</u>

In his written decision, the ALJ made the following findings:

- Plaintiff has not engaged in substantial gainful activity since June 23, 2017, the application (and alleged onset) date (tr. 12);

- Plaintiff has the following severe impairments: type II diabetes mellitus, neuropathy, gastroesophageal reflux disease, gallstones, status post gallbladder removal surgery, lumbago, sciatica, and plantar fasciitis (*id.*);

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 15);

- Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 416.967(b), except she can occasionally push and pull using foot pedals (*id.*);

- Plaintiff is capable of performing past relevant work as a fast food manager, which does not require the performance of work-related activities precluded by Plaintiff's RFC (*id.* at 19);

- Plaintiff has not been under a disability, as defined in the Act, since June 23, 2017, the date the application was filed (*id.* at 20).

## STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence in the record and based on application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.'"); *see also Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d

1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Lewis*, 125 F.3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)); *Lewis*, 125 F.3d at 1439. In determining whether substantial evidence supports the ALJ's decision, the court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).

To qualify as a disability, the physical or mental impairment must be so severe that

the claimant not only is unable to perform her previous work "but cannot,

considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."   *Id*.

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a

disability claim in five steps:

1.     If a claimant is performing substantial gainful activity, the claimant is

not disabled.

2.     If a claimant is not performing substantial gainful activity, the

claimant's impairments must be severe before the claimant can be found disabled.

3.     If a claimant is not performing substantial gainful activity and has

severe impairments that have lasted or are expected to last for a continuous period

of at least twelve months, and if the impairments meet or medically equal the criteria

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits (DIB) or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).   Hence, citations in this Order and Report and Recommendation should be considered to refer to the appropriate parallel provision.   The same applies to citations of statutes or regulations found in quoted court decisions.

of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant

is presumed disabled without further inquiry.

    4.    If a claimant's impairments do not prevent the claimant from

performing past relevant work, the claimant is not disabled.

    5.    Even if the claimant's impairments prevent performance of past

relevant work, if other work exists in significant numbers in the national economy

that accommodates the claimant's RFC, the claimant is not disabled.

    The claimant bears the burden of establishing a severe impairment that

precludes past work.  20 C.F.R. § 404.1512.  If a claimant establishes such an

impairment, the burden shifts to the Commissioner at step five to show the existence

of other jobs in the national economy which, given the claimant's impairments, the

claimant can perform.  *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).

If the Commissioner carries this burden, the claimant must then prove she cannot

perform the work identified by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007,

1011 (11th Cir. 1987).

### FACTUAL BACKGROUND[4]

---

[4] The recitation of facts set forth below is derived from the administrative record and Plaintiff's testimony at the hearing before the ALJ and is limited to facts bearing on the issues Plaintiff has raised on appeal.  Moreover, although the timeframe relevant to Plaintiff's claim for SSI is June 23, 2017 (date she applied for SSI), through June 10, 2019 (date of the ALJ's decision), the

On December 1, 2016, Plaintiff visited the emergency department of Baptist Hospital, complaining of abdominal pain and neuropathy in her hands and feet (*id.* at 281–82).   A provider administered morphine for pain and prescribed tramadol, sucralfate, and ondansetron (*id.* at 281, 283).   Treatment notes reflect appropriate strength, symmetry, and movement in all extremities with normal ambulatory status (*id.* at 282).   Plaintiff presented to the emergency room again on December 12, reporting abdominal pain (*id.* at 291, 296).   A CT scan showed coarse calcifications consistent with a history of pancreatitis (*id.* at 314).   A provider prescribed Norco for pain (*id.* at 298).

Several days later, on December 15, Plaintiff visited St. Joseph Medical Clinic (St. Joseph), a charity clinic, for what appears to have been abdominal issues— specifically, problems stemming from the pancreas and gallbladder (*id.* at 381). Treatment notes indicate Plaintiff was in the process of applying for the We Care

---

undersigned addresses evidence predating the application date, which is the same as the alleged onset date, recognizing it is of limited relevance.   While it is true that in some cases, records predating the alleged disability onset date are not relevant to the ALJ's analysis, in other cases, such records may be relevant.   Here, the ALJ considered evidence predating the alleged application/onset date.   *See Carmickle v. Astrue*, 533 F.3d 1155, 1165 (9th Cir. 2008) (evidence that predates the alleged period of disability may be of limited relevance); *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004) (evidence that predates the alleged onset date may be relevant to claimant's medical history); *Lackey v. Barnhart*, 127 F. App'x 455, 458 (10th Cir. 2005) (ALJ should not ignore medical reports simply because they predate the alleged onset of disability).

Program, a program the State of Florida administers in an effort to procure low cost medical care for uninsured patients, in order to get treatment for gallstones, which the provider indicated "might be the answer to her problems" (*id.*).

On January 9, 2017, Plaintiff visited the Metabolic Syndrome Clinic at St. Joseph (*id.* at 380). Plaintiff's glucose level was slightly elevated, and notes reflect Plaintiff had "not been taking metformin due to anorexia from gallbladder" (*id.*). Plaintiff returned to St. Joseph on January 12 for prescription refills (*id.* at 379). Treatment notes indicate Plaintiff was referred for surgery—presumably gallbladder removal surgery (*id.*). When Plaintiff returned to the Metabolic Syndrome Clinic on January 30, the provider indicated the plan was to "stay the course" (*id.* at 377). Notes from February 7 reflect elevated hemoglobin and hematocrit levels, along with degenerative arthritis in both hands and gallbladder disease (*id.* at 375, 386). The provider refilled prescriptions for tramadol and promethazine (*id.* at 376). When Plaintiff returned to St. Joseph on April 18, she was still waiting for an appointment with We Care (*id.* at 374). Her glucose level was elevated (*id.*). The provider refilled the tramadol prescription (*id.*). One week later, Plaintiff's glucose level had improved (*id.* at 373).

Plaintiff visited the emergency department at Sacred Heart Hospital on June 2, 2017, reporting abdominal pain that radiated into her back, which Plaintiff

reported at levels seven and eight on a ten-point scale and described as preventing her from sleeping (*id.* at 342–44, 347–51). Plaintiff was mobile without limitation but again had elevated hemoglobin and hematocrit levels (*id.* at 350–51). The provider administered morphine and Zofran (*id.* at 353–54). Upon discharge, Plaintiff ambulated without assistance (*id.* at 351). Lab work performed three days later, on June 5, showed elevated hemoglobin and hematocrit levels (*id.* at 383). On June 15, Plaintiff requested a refill of tramadol (*id.* at 372).

The Lakeview Center, a public mental health clinic, conducted a mental health assessment of Plaintiff on June 30, 2017, pursuant to a referral by Plaintiff's primary care providers (*id.* at 398–400). The results were largely normal, with normal motor activity, good attention, and good concentration, although Plaintiff was anxious and depressed (*id.*). Plaintiff reported that health problems, including neuropathy, gallstones, and pancreatitis, contributed to her anxiety (*id.* at 400).

Plaintiff visited St. Joseph on July 6 for refills of tramadol and Phenergan (*id.* at 371). Plaintiff returned on July 25 for another tramadol refill (*id.* at 370). Laboratory tests conducted on August 1 revealed a slightly elevated hemoglobin level (*id.* at 382–83).

Plaintiff completed a Supplemental Pain Questionnaire on August 9, 2017, in which she reported constant and debilitating pain in her feet, ankles, hands, and

upper abdomen through the upper back (*id.* at 219–21).   When asked to explain factors that increased the pain, Plaintiff indicated pressure on her feet, hands, and abdomen, as well as bending, sitting, standing, temperature extremes, eating, and sleeping (*id.* at 219).   Plaintiff indicated she took gabapentin for diabetic peripheral neuropathy in her hands and feet and tramadol for pancreatitis and cholecystitis (*id.* at 220).   She said the medication was "[no]t very effective for [her] type of pain"; she also stated, however, that she had not tried any form of therapy or treatment for pain relief other than medication, except to lie in bed with her feet propped up to alleviate pressure on her feet (*id.*).

Plaintiff indicated that her mother, with whom she lived, did the housekeeping because she could not perform the work due to "[t]oo much stress on [her] body"; she said her mother also did the shopping because it involved too much walking and standing, the former of which caused more pain in her upper abdomen "from the joggling" (*id.*).   Plaintiff stated she did laundry "in short intervals" because she had to keep lying down due to pain and shortness of breath (*id.*).   She said her mother drove "because of the pressure in [her] hands and feet" and "[b]umps in the road cause[d] more pain in [her] abdomen" (*id.* at 221).   Cooking and preparing meals caused pain because of the standing and lifting of pots and pans (*id.* at 220). Plaintiff stated she was unable to do yardwork and gardening because of "excess

strain" (*id.* at 221).   She indicated she could not "sit very long because of pressure on [her] organs" and noted that "constant pain ma[de her] anxious" (*id.*).   Standing, however, "cause[d] pain in [her] ankles and feet" (*id.*).   She said she had to wear flip flops to avoid pressure on the backs of her heels and tops of her feet (*id.*).   And she indicated walking caused pain in her feet and abdomen (*id.*).   Finally, Plaintiff stated she used a walker to maintain balance because of neuropathy (*id.*).

Plaintiff's mother completed a Supplemental Third Party Pain Questionnaire the same day—on August 9, 2017 (*id.* at 216–18).   Plaintiff's mother indicated Plaintiff had constant pain in the abdomen, hands, and feet (*id.* at 216).   She said Plaintiff used lidocaine patches on the palms of her hands and feet and had been to the emergency room several times for abdominal pain, for which providers administered morphine injections (*id.* at 216–17).   In response to a question asking whether Plaintiff had required other types of treatment or therapy for pain relief, Plaintiff's mother stated Plaintiff was "[u]nable to be treated due to no insurance and no money" (*id.* at 217).

Plaintiff's mother indicated Plaintiff was unable to stand for any length of time and that she did the shopping and majority of the cleaning (*id.*).   She stated Plaintiff did her own laundry "in spurts" (*id.*).   She indicated Plaintiff's driving was "very limited" and that Plaintiff stood for a "maximum of 15 minutes" and used a

walker "due to neuropathy—pain in feet and numbness in legs" (*id.* at 217–18). Finally, Plaintiff's mother stated that due to chronic pain, Plaintiff's "life ha[d] dramatically changed—physically she[] is unable to function," which had "mentally affected her socially" (*id.* at 218). According to Plaintiff's mother, Plaintiff was "in her room the majority of the day" (*id.*).

Due to abdominal pain and other gastric symptoms, Plaintiff sought treatment in the emergency department of West Florida Hospital on August 19, 2017 (*id.* at 425). Plaintiff had full range of motion in her back and denied back, joint, and neck pain (*id.* at 426, 428). Treatment notes indicate Plaintiff had been waiting for gallbladder surgery since December 2016 (*id.* at 425). The provider administered a combination of oxycodone and acetaminophen (*id.* at 430).

Plaintiff visited St. Joseph for follow-up treatment on August 24 (*id.* at 453). The provider was unable to refill the tramadol prescription (*id.*). The provider noted, however, that Plaintiff had sought treatment in the emergency department, was waiting for gallbladder surgery, and had neuropathy in the hands and feet (*id.*). Plaintiff visited St. Joseph again on August 28, complaining of increased abdominal pain and neuropathy in the hands and feet (*id.* at 451). Dr. Thomas R. Schneider referred Plaintiff for surgery (*id.*).

Plaintiff returned to St. Joseph on September 11, 2017, seeking a refill of tramadol (*id.* at 450). Treatment notes indicate Plaintiff reported persistent pancreatitis and was still waiting for gallbladder surgery (*id.*). The notes also reflect Plaintiff had neuropathy and was experiencing "[h]ypoglycemic episode[s] in afternoons" (*id.*). The provider, who appears to have been Dr. Schneider, assessed pancreatitis, refilled the tramadol prescription, and noted "script for walker" (*id.*). A Progress Note dated September 18, 2017, reflects Plaintiff felt well except for pain and that Plaintiff needed gallbladder surgery "asap" (*id.* at 448). The provider again assessed pancreatitis (*id.*).

Notes from an October 30 visit to the Metabolic Syndrome Clinic indicate Plaintiff was on metformin until December 2016 but had not taken it since that time and was still awaiting gallbladder surgery (*id.* at 444). It appears Plaintiff had no abdominal pain that day (*id.*). Plaintiff returned to St. Joseph on December 12 for a refill of tramadol (*id.* at 467). The treatment notes indicate Plaintiff had laparoscopic gallbladder surgery one week before the December 12 visit (*id.*).

On December 18, 2017, the disability office received an undated letter from of Dr. Schneider, addressed "To Whom it May Concern" (*id*. at 455). Dr. Schneider stated he had treated Plaintiff for approximately three years for peripheral neuropathy, pancreatitis, gallbladder disease, severe fatigue, pain syndrome, muscle

weakness, disequilibrium, lack of concentration, and inability to sit for more than ten to fifteen minutes at a time (*id.*). Dr. Schneider indicated Plaintiff's mental status was intact but that Plaintiff was being treated for depression secondary to pain and neuropathy and was on a waitlist for gallbladder surgery (*id.*). Dr. Schneider opined Plaintiff was "medically disabled from employment and there [was] little likelihood for sustained accountable improvement," although gallbladder surgery was expected to "help diminish part of her abdominal pain" (*id.*). Dr. Schneider indicated Plaintiff's "extremity limitations" were well documented and showed "slow progressive deterioration" (*id.*).

During a follow-up appointment on January 4, 2018, Plaintiff requested another refill of tramadol (*id.* at 466). Treatment notes indicate Plaintiff had chronic foot and back pain but was going on a trip with her mother (*id.*). On February 27, Plaintiff reported pain in her right thumb for the past three months, which felt like a fracture or trigger finger (*id.* at 464). Plaintiff returned to St. Joseph on March 20 due to her thumb (*id.* at 463). She indicated an injection helped her right thumb but complained of symptoms in her left thumb (*id.*).

During a visit on March 27, 2018, Plaintiff complained of bilateral heel pain (*id.* at 461). The provider diagnosed bilateral plantar fasciitis and prescribed stretching exercises and ibuprofen (*id.* at 462). Plaintiff returned to St. Joseph on

April 4 due to bilateral heel pain (*id.* at 459).   The provider noted Plaintiff walked

with a limp and displayed decreased vibratory sensation (*id.* at 460).   The provider

diagnosed plantar fasciitis, neuropathy, and radiculopathy (*id.*).   Plaintiff returned

to St. Joseph the next day for follow-up regarding her blood sugar level; notes reflect

a prescription for heel pads (*id.* at 458).

Plaintiff visited the Metabolic Syndrome Clinic on June 11, 2018 (*id.* at 481).

Her blood sugar was elevated, as a result of which the provider prescribed metformin

(*id.*).   Plaintiff had no other complaints at the time, and treatment notes reflect stable

diabetes (*id.*).

Plaintiff returned to St. Joseph on August 1 due to foot pain (*id.* at 480).

Examination revealed pain upon palpation of the heels (*id.*).   The provider assessed

plantar fasciitis (*id.*).   Toward the end of the month, on August 28, Plaintiff

described a "sudden catch" in her back for approximately two weeks, without leg

pain or weakness (*id.* at 478).   Treatment notes indicate Plaintiff had a muscle

spasm in her back (*id.*).   The provider administered bilateral back injections and

prescribed lidocaine and Flexeril (*id.* at 479).

Plaintiff presented to the emergency department at Sacred Heart Hospital on

September 9, 2018, complaining of a lower back injury that occurred two weeks

prior to the visit while moving a heavy glass door (*id.* at 494).   The same note

reflects Plaintiff complained of low back pain for the past "1.5 month[s]" with transient alternating sciatic pain to each leg after pushing a sliding door and twisting her back (*id.*).   Plaintiff said cortisone injections did not alleviate the pain (*id.*).   Plaintiff had normal range of motion and alignment in the back, however, and a negative straight leg raise with intact active and passive range of motion in the legs (*id.* at 495).   The treatment notes reflect Plaintiff walked into the restroom, used the restroom, got dressed, and walked to the bed (*id.*).   There was "no marked visual outward distress," although the provider noted Plaintiff was "very thin" (*id.*).

Imaging of the lumbar spine showed no acute bony abnormality (*id.* at 486). A CT scan of the abdomen and pelvis, however, revealed advanced degenerative disc and endplate disease at L5-S1 (*id.* at 488).   The provider diagnosed lumbago with sciatica and discharged Plaintiff (*id.* at 490, 500).   Notes from a September 18 visit to St. Joseph indicate Plaintiff had a history of back pain for which she was to receive additional injections (*id.* at 476–77).   The notes reference the September 9 visit to Sacred Heart (*id.* at 476).

Plaintiff visited the Metabolic Syndrome Clinic on September 24, 2018 (*id.* at 474).   Treatment notes indicate a provider had prescribed metformin and Plaintiff had been only twenty-six percent compliant in taking the medication as prescribed (*id.*).   The notes also reflect Plaintiff engaged in light physical activity, which

apparently included daily resistance training (*id.*). The provider diagnosed chronic low back pain (*id.* at 475).

On October 10, 2018, Plaintiff again sought treatment at the Sacred Heart emergency department for acute bilateral low back pain with right-sided sciatica, which purportedly had increased in severity and caused an unsteady gait for which Plaintiff used a walker (*id.* at 519). Plaintiff denied injury/trauma to the lower back and reported a history of low back pain (*id.*). Plaintiff also indicated she was disabled but had been helping her mother with housework, cleaning, and gardening, which worsened the pain, as did bending, lifting, and twisting her back (*id.*). Plaintiff indicated Motrin and lying on her left side helped with the pain; she also said Flexeril "help[ed] her tremendously" (*id.*). She requested a prescription for Flexeril and "something stronger than Motrin over-the-counter" (*id.* at 519–20). The provider noted Plaintiff ambulated without difficulty and "got up and drove herself to the ER without any difficulties" (*id.* at 519). The provider explained that he or she could not prescribe narcotics for chronic conditions and prescribed toradol for three days (*id.* at 520–21).

During October 16 and November 13 visits to St. Joseph, the provider noted recurrent low back pain as Plaintiff's primary symptom and that injections had failed to alleviate the back pain but had helped alleviate pain in Plaintiff's thumb (*id.* at

472–73, 561–62).    During a December 12 visit, the provider indicated Plaintiff had sudden onset low back pain and diabetic neuropathy (*id.* at 560).    Plaintiff again complained of low back pain during a January 8, 2019, visit (*id.* at 558–59).    At a January 29 appointment, Plaintiff reported that an injection administered on January 8 had helped but that she had recurrent pain (*id.* at 556).    The provider refilled a prescription for Flexeril (*id.* at 557).    Notes  from  a  February  6  visit  indicate Plaintiff  had  been  referred  by  Dr.  Schneider,  who  apparently  worked  at  the Metabolic Syndrome Clinic, for low back pain that started seven months prior to the visit (*id.* at 555).

Plaintiff testified at the hearing before the ALJ.    She said she was fifty-seven years old and completed the twelfth grade (*id.* at 59–60).    She also completed "[s]ome vocational school," studying electronics, although she never worked in the field (*id.* at 60).    Instead, Plaintiff worked as an office manager and fast food restaurant manager (*id.* at 60, 62–63).    She also worked in retail sales (*id.* at 61). Plaintiff testified that while working as a sales clerk, she was required to lift and carry "off and on all day" (*id.* at 64).    She lifted, pushed, and/or pulled up to forty-pound boxes (*id.*).    The same was true of her job as a restaurant manager (*id.*). Plaintiff last worked in 2009 (*id.* at 62).

With regard to her medical condition, Plaintiff confirmed she had been on a waitlist to be evaluated for possible gallbladder surgery for approximately one year and three months and had the surgery in December 2017 (*id.* at 65–66). Before the surgery, Plaintiff had "[a] lot of pain, vomiting, and diarrhea," which "was causing pancreatitis" and weight loss (*id.* at 67). Plaintiff testified she "had a hard time getting over" the surgery but that it provided some relief (*id.*). Plaintiff added that although she lost weight as a result of the gallbladder problem, she lost "even more weight when [she] hurt [her] back and got sick" (*id.*). With regard to medication, Plaintiff testified she took gabapentin for neuropathy, methadone for pain, and metformin for diabetes (*id.* at 68).

Upon questioning by her counsel regarding symptoms of her conditions, Plaintiff testified she did not sleep well "at all"—typically, only "an hour to two hours at a time" due to pain, which rendered her unable to "get comfortable" (*id.* at 70). She slept with "pillows built up to where [she was] basically sitting up in bed" (*id.*). She said she got up around 3:00 or 4:00 in the morning and went out to the screened porch, where there was "a comfortable chair that [had] pillows situated, positioned to where [it was] comfortable" (*id.*). She was unable to cook much because of "lifting, standing, bending over to get down into the cabinets," which hurt, as did washing dishes due to the fact that her hands were sensitive to heat and

cold because of neuropathy (*id.* at 71). When asked whether she used a walker to maneuver around her house, Plaintiff said she "use[d] it to basically transport things and keep . . . steady if . . . feeling dizzy, dizzy that day or weak" (*id.*). Counsel inquired as to the types of things Plaintiff transported using her walker, and Plaintiff responded "[l]aundry, water to water [her] plants, just anything that weighs about as much as a gallon of milk or more" (*id.* at 71).

Plaintiff testified she was unable to unload dishes from the bottom rack of the dishwasher because it was "too difficult to then bend over and lift and reach" (*id.* at 71–72). She said she was unable to vacuum because it put "too much pressure on [her] back" (*id.* at 72). When she engaged in activity such as transporting laundry and watering plants, she was able to do so for only about ten minutes before having to take a break to "sit down [in her recliner] and try to get pressure relief on [her] legs and [her] back" (*id.*). Counsel asked Plaintiff how often she shopped, and Plaintiff said "[n]ot very often" because of the "reaching and lifting the groceries from the shelf into the buggy and the walking around," which "cause[d] a lot of pain" (*id.*). Plaintiff said she shopped for only about twenty minutes at a time and, on more than one occasion, had to leave groceries in the store because she was not feeling well (*id.* at 72–73).

Plaintiff testified she had to change the way she cooked and that it was "easier to make a big pot of say stew or something and make it last for more than one night so [she could] just reheat [it] the next night" (*id.* at 73).   Making enough for leftovers was easier because she did not have to stand as long or clean up as many dishes as cooking from scratch every night, which caused pain (*id.*).   When asked if she could walk an entire block, Plaintiff said, "No. I'd say probably about—well, it depends.   Like it hurts not to walk on something flat.   It pulls on my back if it's not flat" (*id.*).   She then clarified that she could not walk an entire block "on a sidewalk or something" (*id.*).   When asked if she ever left the house without her walker, Plaintiff responded, "No. I use it all the time" (*id.*).   When asked how long she thought she could stand before having to take a break, such as when working at a cash register, Plaintiff said "[p]robably about ten minutes" (*id.* at 74).   If sitting in a reasonably comfortable chair, Plaintiff could sit for approximately ten to fifteen minutes before having to "move or do something or were [sic] distracted by pain" (*id.*).

Counsel questioned Plaintiff about her treatment at a methadone clinic. Specifically, counsel asked Plaintiff whether methadone relieved some of the pain. Plaintiff said "[s]omewhat.   Not much, but—" it "knock[ed] it down . . . [a] little bit" (*id.*).   She also affirmed it "slow[ed] down [her] mental processing," explaining

it made her "sort of flighty and sort of like taking cold medicine" (*id.* at 74–75). Plaintiff then said she did not take cold medicine (*id.* at 75).

After counsel completed his questioning of Plaintiff, the ALJ asked additional questions. First, the ALJ inquired as to how Plaintiff qualified for treatment at a methadone clinic (*id.*). Plaintiff responded that she "just asked for the help" and "got [her mother] to help . . . pay for it" (*id.*). Plaintiff testified the clinic did not require any medical documentation and, instead, just questioned her, including as to how long she had been taking pain medication (*id.* at 75–76). She said she was not referred to the clinic and that the clinic did not require a physician's referral (*id.* at 76). The ALJ asked Plaintiff whether she had recently had an MRI of her back, and Plaintiff stated she was "on a waiting list for that" (*id.*).

The ALJ then asked Plaintiff about her daily activities. Plaintiff testified she sometimes drove and, in fact, drove herself to the hearing, which took approximately twenty-five minutes (*id.*). She confirmed she smoked cigarettes, about half a pack per day (*id.* at 76–77). She said she did not drink alcohol (*id.* at 77). Plaintiff said she had been living with her mother, who she "help[ed] . . where [she could,]" for five years (*id.*).

A vocational expert, Debbie Rose, also testified at the hearing (*id.* at 63). Dr. Rose testified that Plaintiff had past relevant work as a fast food manager, which is

light, skilled work, and as a sales clerk, which is light, semi-skilled work (*id.* at 64). The ALJ asked Dr. Rose whether Plaintiff would have acquired any skills through her work as a restaurant manager and sales clerk that would transfer to a sedentary job (*id.* at 65). Dr. Rose responded that Plaintiff would not have acquired such skills (*id.*).

The ALJ then posed a number of hypotheticals. For the first hypothetical, the ALJ asked Dr. Rose to assume a hypothetical person who was the same age and had the same educational level as Plaintiff, had some vocational training in electronics, had engaged in the same work as Plaintiff, and could perform a full range of light work (*id.* at 78). The ALJ asked Dr. Rose whether such a person could perform Plaintiff's past work (*id.*). Dr. Rose responded that such an individual could perform both jobs as normally performed in the general economy (*id.* at 78–79). The ALJ asked Dr. Rose to provide examples of other light jobs such an individual could perform (*id.* at 79). Dr. Rose identified ticket taker, mail sorter, and parking lot attendant, all of which are light, unskilled work (*id.*).

As a second hypothetical, the ALJ asked Dr. Rose to assume the same hypothetical individual previously described but who was limited to simple work that was not fast-paced like production work (*id.*). The ALJ then asked whether such an individual would be able to perform Plaintiff's past work (*id.*). Dr. Rose

responded "No, sir," and explained that such an individual would be unable to return to Plaintiff's past work or perform the other jobs the ALJ identified because the jobs are fast-paced at times (*id.* at 79–80). Dr. Rose testified that such an individual could work as a linen grader, garment bagger, and silverware wrapper, all of which are light and unskilled (*id.* at 80).

The ALJ posed a third hypothetical, asking Dr. Rose to assume the same individual as in the previous hypothetical but who required a cane to assist with balance and walking (*id.* at 80–81). The ALJ acknowledged that such an individual would be unable to perform Plaintiff's past work and asked Dr. Rose whether such individual would be able to perform the jobs identified in response to the prior hypothetical (*id.* at 81). Dr. Rose testified that such an individual would be unable to perform any work at the light, sedentary level because, in order to perform the jobs previously identified or any others, the individual would need to be able to occasionally balance without the use of an assistive device (*id.*). In other words, according to Dr. Rose, such an individual would be unable to work (*id.*).

The ALJ then posed a new hypothetical, asking Dr. Rose to assume an individual able to perform light work with occasional pushing and pulling with foot pedals who was not limited to simple work or use of an assistive device (*id.*). The ALJ asked Dr. Rose whether such an individual would be able to perform any of

Plaintiff's past work (*id.*).   Dr. Rose testified that such an individual would be able to work as a sales clerk and fast food manager according to Dictionary of Occupational Titles descriptions but not as Plaintiff actually performed the jobs (*id.* at 81–82).   Such an individual could also work as a ticket taker, mail sorter, parking lot attendant, linen grader, garment bagger, and silverware wrapper (*id.* at 82).

The ALJ added to the hypothetical that the individual would be able to perform only simple work that was not fast-paced (*id.* at 82–83).   Dr. Rose testified that such an individual would be unable to perform Plaintiff's past work or any other work (*id.* at 83).   Dr. Rose then clarified that such an individual could work as a linen grader, garment bagger, and silverware wrapper (*id.*).   The ALJ added that the hypothetical individual would require a cane to assist with balance and walking (*id.*).   Dr. Rose responded that the additional limitation would preclude all work (*id.*).

The ALJ posed another hypothetical, asking Dr. Rose to assume an individual who could perform light work but was limited to standing and walking only four hours, and sitting only six hours, in an eight-hour workday—i.e., an individual who was not limited to simple work and did not require an assistive device and could perform a reduced range of light work (*id.* at 83–84).   The ALJ asked Dr. Rose whether such an individual could perform Plaintiff's past work (*id.* at 84).   Dr. Rose testified that such an individual would be unable to perform Plaintiff's past work and

would be limited to sedentary work, such as surveillance system monitor, ticket checker, and information clerk, all of which are sedentary, unskilled jobs (*id.*).

The ALJ directed Dr. Rose's attention to Dr. Schneider's letter explaining Plaintiff's diagnoses and limitations, including lack of concentration, inability to sit for longer than ten to fifteen minutes, extremity limitations, muscle weakness, and disequilibrium (*id.* at 85). The ALJ asked Dr. Rose whether, with those limitations, the hypothetical individual would be able to perform any of Plaintiff's past work (*id.*). Dr. Rose essentially responded that without specific limitations on concentration and how much of the workday the individual would be required to sit or walk, Dr. Rose was unable to make a determination in that regard (*id.*).

Plaintiff's counsel also questioned Dr. Rose. First, counsel asked the following—"[o]bviously, if somebody suffers from muscle weakness such that they cannot lift 20 pounds occasionally for up to 2 hours a day, they wouldn't be able to do any of the jobs you identified at the light exertional level, correct?" (*id.* at 86). Dr. Rose responded "No, sir. They would not be able to." (*id.*). Counsel then asked "[i]f somebody were to suffer from the exacerbations of pain that took them off task 10% or more of the day, would they be able to do any of the jobs that you have identified or any other jobs in the economy?" (*id.*). Dr. Rose responded that such an individual would not be able to perform any of the jobs on a continuous

basis and explained that "[p]eople at this level because it's unskilled work, employers are looking for dependability, reliability, and persistence" (*id.*).   Counsel asked if "somebody were to suffer from a condition that caused them to be out of work or absent from work on an unscheduled basis two or more times per month, would that eliminate all of the jobs you identified?" (*id.*).   Dr. Rose responded "Yes, sir.   It would." (*id.*).

<u>DISCUSSION</u>

I.    Hand-Held Assistive Device

As indicated above, as the first contention of error, Plaintiff asserts the ALJ erred in finding she does not require a hand-held assistive device, arguing "[t]he record evidence consistently reflects the reality that [she] requires a cane or walker" (ECF No. 13 at 19).   SSR 96–9p provides as follows with regard to medically required hand-held assistive devices:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96–9p.[5]

_____

[5] Although the title of SSR 96-9p references "Implications of an RFC for Less than a Full Range

Here, as the ALJ found, the record contains no medical documentation describing the circumstances for which Plaintiff allegedly needed a hand-held assistive device, much less that Plaintiff required such a device for a continuous twelve-month period. *See* 20 C.F.R. § 416.909. In fact, the evidence belies such an assertion, reflecting that except on perhaps a few occasions, Plaintiff was able to ambulate and engage in other physical activity without a hand-held assistive device.

The only objective medical evidence of record regarding Plaintiff's alleged need for a hand-held assistive device is the September 11, 2017, treatment record from St. Joseph referencing, without explanation, "script for walker" (tr. 450). Notably, "a prescription or the lack of a prescription for a hand-held assistive device is not necessarily dispositive of medical necessity." *Kendrick v. Comm'r of Soc. Sec.*, No. 5:17-cv-244-Oc-18PRL, 2018 WL 4126528, at *3 (M.D. Fla. July 9, 2018) (internal citations omitted), *report and recommendation adopted by* 2018 WL

---

of Sedentary Work," courts have applied the ruling to the light level of exertion. *See, e.g., Kendrick v. Comm'r of Soc. Sec.*, No. 5:17-cv-244-Oc-18PRL, 2018 WL 4126528, at *3 (M.D. Fla. July 9, 2018) (finding that plaintiff with light level RFC did not provide the necessary medical documentation under SSR 96–9p to demonstrate that a hand-held assistive device was needed); *see also Staples v. Astrue*, 329 F. App'x 189, 191 (10th Cir. 2009) (applying SSR 96-9p to plaintiff found to have the RFC to perform light work with restrictions); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (same); *Ortiz v. Saul*, No. 8:19-CV-199-T -CPT, 2020 WL 1527856, at *4 n.6 (M.D. Fla. Mar. 31, 2020) (same). Even if SSR 96-9p did not apply, as set forth below, there is substantial evidence in the record to support the ALJ's decision not to incorporate use of an assistive device in Plaintiff's RFC.

4112832 (M.D. Fla. Aug. 29, 2018)).   And if a claimant has not presented medical documentation establishing her need for a cane or other device and describing the circumstances for which it is needed, an ALJ is not required to include use of an assistive device in the claimant's RFC.  *See Kendrick*, 2018 WL 4126528, at *3. Substantial evidence therefore plainly supports the ALJ's decision not to incorporate use of a hand-held assistive device in Plaintiff's RFC.  *See, e.g., Howze*, 53 F. App'x at 222 (finding appellant's testimony that doctor provided him with a cane to address left-leg weakness that caused him to lose balance and fall, along with doctor's references in the record to "'script' for a cane," doctor checking box for "'hand-held assistive device medically required for ambulation,'" and multiple references in the record to the fact that appellant used a cane, insufficient to establish medical necessity).

II.    Treating Physician's Opinion

As her second assignment of error, Plaintiff argues the ALJ erred in failing to articulate good cause supported by substantial evidence to discredit the statement of Dr. Schneider, one of her treating physicians.   As the Commissioner points out, Plaintiff applies the incorrect legal standard in arguing the ALJ erred with regard to his treatment of Dr. Schneider's statement.   Although opinions of treating

physicians previously were afforded deference, as the Commissioner explains, on

January 18, 2017, the SSA revised its medical evidence regulations, including by

> redefining several key terms related to evidence, revising . . . rules
> about acceptable medical sources (AMS), revising how [the SSA]
> consider[s] and articulate[s] . . . consideration of medical opinions . . .,
> revising . . . rules about treating sources, and reorganizing [its] evidence
> regulations for ease of use.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg.

5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27,

2017)).[6]   The revised regulations went into effect on March 27, 2017, before

Plaintiff filed her application for SSI, and thus apply to Plaintiff's claim.   *See id.*

Among other changes, the revised regulations redefine how evidence is

categorized, specifying five categories of evidence: (1) objective medical evidence,

(2) medical opinion, (3) other medical evidence, (4) evidence from nonmedical

---

[6] As the SSA explained,

> [t]hese revisions conform our rules to the requirements of the Bipartisan Budget
> Act of 2015 (BBA), reflect changes in the national healthcare workforce and in the
> manner that individuals receive medical care, and emphasize the need for objective
> medical evidence in disability and blindness claims.   We expect that these changes
> will simplify our rules to make them easier to understand and apply[] and allow us
> to continue to make accurate and consistent disability determinations and decisions.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18,
2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).

sources, and (5) prior administrative medical finding.  *See* 20 C.F.R. § 416.913(a) (2017).[7]   Pertinent for purposes of this matter, the revised regulations define "medical opinion" as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .

> (i)     Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)
> (ii)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
> (iii)   Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
> (iv)    Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 416.913(a)(2) (2017).   In revising the definition of "medical opinion," the SSA recognized that "[d]iagnoses and prognoses do not describe how an individual functions" and that although the SSA considers a claimant's statements about his or her symptoms, "[a] more appropriate focus of medical opinions would

---

[7] *Compare with* 20 C.F.R. § 416.912(b)(1) (2016).

be perspectives from medical sources about claimants' functional abilities and limitations." 81 Fed. Reg. at 62,562; *see also* 20 C.F.R. § 416.913(a)(2), (3) (2017).[8] "Other medical evidence" includes "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3).

The revised regulations also significantly alter the manner in which an ALJ is to consider and articulate findings regarding medical opinions. *See* 20 C.F.R. § 416.920c (2017). Notably, under the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a) (2017). "When a medical source provides one or more medical opinions . . ., [the ALJ] will consider those medical opinions . . . from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of [§ 416.920c], as appropriate." *Id.* Those factors include the following:

---

[8] By contrast, the prior regulations provided that statements from an acceptable medical source reflecting judgments about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis, and prognosis, are considered "medical opinions." 20 C.F.R. § 416.927(a)(2) (2016); *id.* at § 416.927(a)(1) (2017).

(1)    supportability;
(2)    consistency;
(3)    relationship with the claimant, which includes
  (i) length of the treatment relationship
  (ii) frequency of examinations
  (iii) purpose of the treatment relationship
  (iv) extent of the treatment relationship
  (v) examining relationship;
(4)    specialization; and
(5)    other factors.

20 C.F.R. § 416.920c(a)–(c) (2017).[9]

Supportability and consistency "are the most important factors" the ALJ considers when determining the persuasiveness of a medical source's medical opinions under the revised regulations. 20 C.F.R. § 416.920c(b)(2) (2017). As the SSA recognized, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical

---

[9] An ALJ no longer is required to "give good reasons" for the weight assigned a treating source's opinion. *Compare* 20 C.F.R. § 416.927(c)(2) (2016) and 20 C.F.R. § 416.927(c)(2) (2017) *with* 20 C.F.R. § 416.920c(b) (2017). As the SSA explained:

> Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standards of review, which is intended to be highly deferential standard to us.

82 Fed. Reg. at 5853.

opinion(s) . . ., the more persuasive the medical opinions . . . will be" and, similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."   20 C.F.R. § 416.920c(c)(1) and (2) (2017). Accordingly, the ALJ must now "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] . . . decision."   20 C.F.R. § 416.920c(b)(2).

The ALJ "may, but [is] not required to, explain how [the ALJ] considered the factors in paragraphs (c)(3) through (c)(5) . . . , as appropriate, when . . . articulat[ing] how [the ALJ] consider[ed] medical opinions . . . in [the] case record."   20 C.F.R. § 416.920c(b)(2).   When the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must "articulate how [the ALJ] considered the other most persuasive factors . . . for those medical opinions. . . ." 20 C.F.R. § 416.920c(b)(3) (2017).   The revised regulations deem statements on issues reserved to the Commissioner, including statements that a claimant is or is not disabled, "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled . . . ."   20 C.F.R. § 416.920b(c)(1)–(3) (2017).   In fact, the

regulations dispense with any analysis of the consideration of such evidence.  *See* 20 C.F.R. § 416.920b(c).

Turning to the medical statement at issue in this case, as set forth above, Dr. Schneider offered the following statement in support of Plaintiff's claim for benefits:

> Kindly accept this statement as regards Ms. Janet Adderholt [sic].  I have had the pleasure of treating Janet for approximately 3 years for peripheral neuropathy, pancreatitis, gall bladder disease, severe fatigue, pain syndrome, muscle weakness, disequilibrium, lack of concentration, inability to sit for more than 10–15 minutes.
>
> Ms. Adderholt [sic] has been extremely compliant in selfcare and appointment follow up.  Her mental status is intact but she is [being] treated for depression secondary to her pain and neuropathy.  She currently [is] on a waiting list for gall bladder surgery.
>
> In my opinion, Ms. Adderholt [sic] is medically disabled from employment and there is little likelihood for sustained accountable improvement.  Her gall bladder surgery will help diminish part of her abdominal pain.
>
> Her extremity limitations have been well documented and have shown slow progressive deterioration.
>
> If I can be of further help, please contact [me] through St. Joseph's health clinic.

(tr. 455).

The ALJ found Dr. Schneider's statement unpersuasive, stating as follows:

> This conclusory opinion does not precisely define the limitations and remaining ability the claimant has due to her impairments.  It is not supported by specific reference to negative symptomology that would prevent the claimant from being able to work and it is inconsistent with the record as a whole, which documents the presence of severe, but not disabling, impairments.  Further, determinations of disability are

reserved to the Commissioner (20 C.F.R. 416.920b).   As such, Dr. Schneider's opinion is not persuasive.

(*id.* at 19).

Plaintiff argues that if Dr. Schneider's statement, or portions thereof, constitute an opinion of limitation from a treating physician, the ALJ was required to give it great weight absent a showing of good cause supported by substantial evidence for not doing so.   In the event the opinion is not a medical opinion and, instead, constitutes only an opinion on the ultimate issue of disability, Plaintiff contends the ALJ was required to "'carefully consider'" the opinion as to the issue of disability (ECF No. 13 at 29–30).   Plaintiff's position is unavailing.

First, contrary to Plaintiff's assertion, the ALJ is not required to offer substantial evidence to support his decision.   The substantial evidence standard applies to *this court's review of the ALJ's decision* and, as previously noted, is highly deferential. Even if the ALJ did not cite substantial evidence in support of his decision, or any aspect thereof, the decision may still be affirmed as long as it is based upon proper legal standards and substantial evidence in the record supports it.[10]   *See* 42 U.S.C. § 405(g); *Falge*, 150 F.3d at 1322; *Lewis*, 125 F.3d at 1439

---

[10] It bears noting—or even emphasizing—that Plaintiff does not argue the ALJ's decision in fact is not supported by substantial evidence in the record.

Second, Dr. Schneider did not impose any limitations on Plaintiff. Rather, Dr. Schneider identified conditions for which he treated Plaintiff, including peripheral neuropathy, pancreatitis, gallbladder disease, severe fatigue, pain syndrome, muscle weakness, disequilibrium, lack of concentration, and inability to sit for more than ten to fifteen minutes, which essentially constitutes a listing of diagnoses. As set forth above, the applicable regulations do not consider statements about an individual's diagnoses, prognosis, or symptoms to constitute a medical opinion. *See* 20 C.F.R. § 416.913(a)(2) and (3). Moreover, even if Dr. Schneider's statement could be construed as imposing limitations on Plaintiff, Dr. Schneider offered no objective medical findings in support of any alleged limitation, and Plaintiff has pointed to no such support in Dr. Schneider's treatment notes other than a single notation in December 2017 that Plaintiff's "conditions cause disequilibrium," which plainly adds scant support for any alleged limitation on Plaintiff's ability to work (ECF No. 13 at 33).

Third, Dr. Schneider's statement that Plaintiff is medically disabled from employment with little likelihood for sustained accountable improvement is a statement regarding an issue reserved to the Commissioner and thus requires no deference or even analysis. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p.

Finally, substantial evidence in the record supports the ALJ's finding that Dr. Schneider's statement was unpersuasive. As set forth above, supportability and consistency are the most important factors to consider in assessing the persuasiveness of a medical source's opinion and the only factors the ALJ must address. *See* 20 C.F.R. § 416.920(b)(2). Here, in finding Dr. Schneider's statement unpersuasive, the ALJ noted that Dr. Schneider's statement not only is unsupported by specific references to negative symptomology that would prevent Plaintiff from being able to work, but it also is inconsistent with the record as a whole (tr. 19). As the ALJ observed, Plaintiff's treatment records simply do not support strength, balance, or sitting limitations exceeding a light-level RFC (*id.* at 15, 18–19). The medical records also indicate Plaintiff's treatment was largely effective (*id.*).

Specifically, with regard to diabetes, the ALJ noted there was "no evidence of end organ damage, diabetic ketoacidosis, peripheral vascular disease, diabetic gastroparesis, diabetic nephropathy, poor healing infections, or episodes of cognitive impairment" (*id.* at 16–17).

With respect to back pain, the ALJ observed that Plaintiff was treated for lumbago and sciatica and reported chronic back pain during a January 4, 2018, visit to St. Joseph (*id.* at 18). A provider at St. Joseph administered steroid injections in

August and September 2018 (*id.* at 18, 476–79).   Plaintiff visited the emergency department of Sacred Heart Hospital on September 9, 2018, complaining of low back pain from moving a heavy glass door (*id.* at 18, 507).   She complained of continued back pain despite having received injections (*id.*).   Examination, however, revealed normal range of motion, normal alignment, and negative straight leg raises with intact active/passive range of motion in the legs (*id*. at 18, 495).   Moreover, the treatment records indicate Plaintiff walked into the restroom, used the restroom, got dressed, and walked to the bed with no marked visual outward distress (*id.* at 495). X-ray images of the lumbar spine were unremarkable and showed no acute bony abnormality, although an abdominal CT scan revealed L5-S1 degenerative disc disease (*id*. at 18, 486–88, 497).   The provider diagnosed Plaintiff with lumbago with sciatica and dispensed a seven-day prescription of pain medication, with no recommendation of additional treatment (*id*. at 18, 498–500).

Plaintiff returned to the emergency room at Sacred Heart Hospital on October 10, 2018, again complaining of low back pain (*id*. at 18, 519).   Plaintiff's symptoms were characterized as dull and achy, and the degree both at onset and when Plaintiff presented to the emergency room was described as minimal (*id.* at 520).   The treatment notes reflect Plaintiff drove herself to the hospital and was able to ambulate around the emergency room without difficulty, exhibiting normal range of motion

(*id*. at 18, 519, 521).    Plaintiff requested a prescription for Flexeril and pain
medication, but the provider denied the request (*id*. at 18, 519–21).    Curiously,
despite requesting something stronger than Motrin, Plaintiff indicated that Motrin,
rest, and lying on her left side relieved the pain (*id*. at 519, 522).    The provider
discharged Plaintiff with a diagnosis of acute bilateral low back pain with right-sided
sciatica, gave Plaintiff a three-day prescription of toradol, and explained there were
"no emergency conditions in the ER to intervene and . . . no further emergency
treatment for acute on chronic musculoskeletal back pain"  (*id*. at 521).    Upon
conclusion of the appointment, Plaintiff ambulated out of the emergency room
without difficulty (*id.* at 521).

During a January 29, 2019, appointment, Plaintiff reported that a back
injection earlier in the month helped relieve low back pain (*id.* at 18, 556).    Notes
from a February 6 visit indicate the provider prescribed Flexeril, which Plaintiff
previously indicated "help[ed] her tremendously" (*id*. at 18, 519, 555).

Based on Plaintiff's treatment history, the ALJ found that the lumbago and
sciatica were "managed medically[] and should be amenable to proper control by
adherence to recommended medical management and medication compliance" (*id*.
at 18).    The ALJ noted that "no aggressive treatment was recommended or
anticipated for these conditions" (*id*.).    The ALJ further noted that he observed

Plaintiff stand and walk at the hearing without putting any weight on the cane she had with her and that there is no medical evidence of record that any provider prescribed Plaintiff a cane for ambulation or even instructed Plaintiff to use such a device (*id*.).

As for plantar fasciitis, Plaintiff complained of bilateral heel pain during visits to St. Joseph on March 27, April 4, and August 1, 2018 (*id.* at 18, 459–62, 480). During the March 27 and April 4 visits, the provider diagnosed plantar fasciitis and instructed Plaintiff to perform stretching exercises and take ibuprofen (*id*. at 18, 459–62). During the April 4 appointment, Plaintiff had a limping gait but was able to walk unassisted (*id.* at 18, 460). During an October 10, 2018, visit to Sacred Heart Hospital, Plaintiff was able to ambulate without difficulty and made no mention of foot pain (*id.* at 18, 519–25). She also made no mention of foot pain during visits to St. Joseph in January and February 2019 (*id*. at 18, 555–59).

Plaintiff was treated for abdominal pain and gallstones, for which she ultimately underwent gallbladder surgery in December 2017, which provided relief of the abdominal symptoms (*id.* at 67, 467). Notably, Dr. Schneider's statement pre-dates Plaintiff's gallbladder surgery and specifically indicates he expected the surgery to help diminish her abdominal pain.

With regard to Dr. Schneider's statement regarding difficulty concentrating, as set forth above, Dr. Schneider did not indicate any manner in which such alleged difficulty impaired Plaintiff's ability to work.   And Dr. Schneider's treatment notes and the record as a whole reflect only a mild limitation, at best, in that regard. Indeed, as the ALJ observed, Plaintiff was able to complete a Supplemental Pain Questionnaire and indicated during an October 10, 2018, visit to Sacred Heart Hospital that she had been gardening, cleaning, and helping with housework, activities consistent with the ability to concentrate (tr. 14, 219–21, 519).[11]   In fact, as of June 30, 2017, one week after the alleged onset date, Plaintiff's concentration and attention were noted to be "good" (*id.* at 14, 399).   Plaintiff was assessed with major depressive disorder, recurrent episode, moderate with moderate anxious distress, and somatic symptom disorder with predominant pain; however, there is no evidence after August 2017 of any complaint related to somatic symptom disorder, nor is there any evidence of therapy, treatment from a mental health professional, or hospitalization related to Plaintiff's psychological condition (*id.* at 400).

---

[11] The undersigned notes that Plaintiff's report of activities during the October 10 visit to Sacred Heart Hospital conflicts with the statements Plaintiff provided in the Supplemental Pain Questionnaire, completed on August 9, 2017 (*see* tr. 219–21).

In sum, Plaintiff has wholly failed to show the ALJ erred with respect to his treatment of Dr. Schneider's statement.

## CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence in the record and application of proper legal standards and, hence, that the decision should affirmed.[14] *See Carnes v. Sullivan,* 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

Accordingly, it is **ORDERED**:

1.    The clerk of court is directed to substitute Kilolo Kijakazi for Andrew Saul as Defendant in this case.

And it is respectfully **RECOMMENDED**:

1.    That the decision of the Commissioner be **AFFIRMED** and this action **DISMISSED**.

2.    That **JUDGMENT** be entered accordingly.

3.    That the clerk be directed to close the file.

---

[14] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review.   *See Moore,* 405 F.3d at 1208.

Case No.: 3:20cv5411/LAC/EMT

At Pensacola, Florida this 27th day of July 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. **Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.** An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.